# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORTH WORTH DIVISION

| | | |
|---|---|---|
| AARON MEADE | § | |
| *Plaintiff* | § | |
| | § | CIVIL ACTION NO. 4:25-CV-00093 |
| v. | § | |
| | § | |
| JAMES HURLEY, in his individual and | § | JURY TRIAL DEMANDED |
| official capacity; MEAGAN O'QUIN, in her | § | |
| individual and official capacity; LONN | § | |
| REISMAN, in his individual and official | § | |
| capacity; AMY BROWDER, in her | § | |
| individual and official capacity; WES | § | |
| HUNT, in his individual and official | § | |
| capacity; DALLAS REED, in his individual | § | |
| and official capacity; TARLETON STATE | § | |
| UNIVERSITY, | § | |
| *Defendants* | § | |

## COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

PLAINTIFF, AARON MEADE, Individually, brings these 42 U.S.C. § 1983 Fourteenth Amendment due process claims against JAMES HURLEY, MEAGAN O'QUIN, LONN REISMAN, AMY BROWDER, WES HUNT, DALLAS REED, and TARLETON STATE UNIVERSITY, Defendants, for intentionally depriving him of his due process rights while initiating, conducting and concluding an official investigation into purported misconduct while Meade was an employee of Tarleton State University, and a claim for tortious interference with prospective business relations under Texas law against Wes Hunt and Dallas Reed.

## PARTIES

1.      Plaintiff Aaron Meade is a citizen of the State of Missouri and resident of Missouri.

2.       Defendant Tarleton State University ("Tarleton") is an agency of the State of Texas and part of the Texas A&M university system. At all relevant times, Tarleton State University employed Defendant James Hurley as President, Megan O'Quinn as Baseball Sport Supervisor, Lonn Reisman as Vice President of Athletics, Amy Browder as an Assistant Director of Employee Development and/or Interim AVP and Director, Wes Hunt as Assistant Coach, and Dallas Reed as Assistant Coach.  Tarleton may be served through citation on President James Hurley at 1333 W. Washington, Stephenville, Texas 76402. Service is requested at this time.

3.       Defendant Hurley, is a resident of Erath County, Texas. At all relevant times, he was employed by Tarleton as President and was acting under color of law.  He may be served with process at Trogdon House at 1333 W. Washington, Stephenville, Texas 76402.  Service is requested at this time.

4.       Defendant O'Quin, is a resident of Erath County, Texas. At all relevant times, she was employed by Tarleton as Baseball Sport Supervisor, and was acting under color of law.  She may be served with process at 221 Moonlight Trail Stephenville, TX 76401.  Service is requested at this time.

5.       Defendant Reisman, is a resident of Erath County, Texas. At all relevant times, he was employed by Tarleton as Vice President of Athletics, and was acting under color of law.  He may be served with process at 107 Lee Trevino St. Stephenville, TX 76401.  Service is requested at this time.

6.       Defendant Browder, is a resident of Erath County, Texas. At all relevant times, she was employed by Tarleton as Assistant Director of Employee Development and/or Interim

AVP and Director, and was acting under color of law. She may be served with process at 1446 N Pecan Hill Dr. Stephenville, TX 76401. Service is requested at this time.

7.    Defendant Hunt, is a resident of Fort Bend County, Texas. At all relevant times, he was employed by Tarleton as Assistant Coach and interim Head Coach, and was acting under color of law. He may be served with process at 903 Shenandoah Falls Lane Rosenberg, TX 77469. Service is requested at this time.

8.    Defendant Reed, is a resident of Texas but his current address is currently unknown to the Plaintiff. At all relevant times, he was employed by Tarleton as Assistant Coach, and was acting under color of law. He may be served with process at an address to be determined as soon as possible. Service will be requested upon locating Defendant Reed.

## JURISDICTION AND VENUE

9.    Because this case is brought pursuant to 42 U.S.C. § 1983, this Court has federal question jurisdiction over the claims arising thereunder. The Court has supplemental jurisdiction over the claim for tortious interference with prospective business relations pursuant to 28 U.S. Code § 1367 because it is related to and from the same case or controversy as the foregoing federal claims.

10.    This Court has personal jurisdiction over Defendants because Defendants reside or are otherwise located in Texas.

11.    Venue is proper in this court because the events giving rise to Plaintiff's claims occurred in Erath County, Texas, which is located within the boundaries of the Fort Worth Division of the Northern District of Texas.

## SUMMARY

12.      Meade is the victim of a fraudulent conspiracy to have him removed as Head Coach of the Tarleton baseball team, a plot motivated initially by the desire of one Assistant Coach to take Meade's job.  Multiple student players were told false and damaging things about Meade by the Assistant Coach and his conspiring colleague in order to frighten them, and to justify urging them to file a complaint with Tarleton about anything they could think of in order to get Meade removed as their Head Coach.

13.      Tarleton immediately suspended Meade and refused to tell him anything about the allegations that resulted in his suspension.  The conspiracy only came to light when some of the players eventually informed Tarleton about what had occurred, but this was not until after Meade had been suspended for the remainder of the season (several months), and only after vicious rumors based on the underlying allegations had spread both locally and in the entire college baseball community nationwide that destroyed Meade's chances of ever again coaching Division I baseball.

14.      Embarrassed by its rush to judgment and failure to follow its own policies being exploited by its own staff, Tarleton's administration decided to hide its discovery of the conspiracy, and instead informed Meade that it would simply not be renewing his contract. Meade's termination was documented by Tarleton as being <u>without</u> <u>cause</u>.  Meade was terminated without ever being provided the results of Tarleton's investigation.  Tarleton did so in order to cover-up how a single Tarleton employee and his conspiring colleague were able to use Tarleton's well-known reckless and indifferent handling of HR complaints to take the job of his own boss.

15.     Meade was "terminated" without cause, despite several years of continuous renewals and promises by Tarleton's President of a longer-term commitment to him as a promising young baseball coach helping Tarleton reach Division I status.  The failure of Tarleton to train and insist on the following of policies and procedures to provide notice and an opportunity to be heard when false allegations were made, and the failure of Tarleton and other Defendants to follow Tarleton's own processes, failure to provide Meade with minimum procedural due process, and the arbitrary and egregious actions taken during and after a reckless investigation eventually revealed the false allegations against Meade, allowed a fraudulent conspiracy against Meade to flourish, fester, and spread, causing the dissemination of false, stigmatizing, and otherwise damaging allegations against Meade, and concealing a financially reckless and otherwise egregious handling of a matter of public concern. All of this ultimately resulted in Tarleton's real motivation not to renew Meade's contract and end his almost four years of continuous employment, even after the nature of the conspiracy was discovered, and the stigmatizing allegations against Meade were demonstrated as materially groundless.

## **FACTS**

16.     In late January and early February 2023, Plaintiff Meade ("Meade") was preparing to coach his fourth continuous year as the Head Baseball Coach of Tarleton.  The Tarleton baseball team participates at the Division I level of the NCAA ("National Collegiate Athletic Association") and is a member of the WAC ("Western Athletic Conference"). During that same time, Defendant Hunt ("Hunt") was serving as an Assistant Coach of Tarleton but had been offered a position by the San Diego Padres.  Rebecca Hunt and Reed's then-

girlfriend Allison Roberts (previously the Director of Creative Communications at Tarleton), urged Dallas Reed and Wes Hunt to do something to get Meade fired so that the Hunts could remain at Tarleton instead of taking the job offer with the Padres.

17.     Out of a desire by Hunt and his wife, Rebecca Hunt, to stay at Tarleton with more responsibility and income, and at the urging and participation of Hunt's friend Defendant Reed, Hunt and Reed (both Assistant Coaches) then together conspired to orchestrate Meade's removal as Head Coach, in order to allow Hunt to assume the position. Hunt and Reed proceeded to convince a group of players on the baseball team to participate in a fraudulent scheme whereby they would make false and damaging allegations about Meade with the intention of getting Meade fired, so that Defendant Hunt could remain at Tarleton and be promoted to Meade's position as Head Coach.

18.     On or about January 31, 2023, a group of eight players met with Hunt and Reed after-hours at the indoor facility at Tarleton.  Reed told players what a bad person Meade was despite any positive opinions of him they might have, how poorly Meade treated Reed and Hunt, that Meade wasn't the coach or person they thought he was, that he was a known liar, owed Reed money, was in-fact a pedophile, and cheated on his wife with Tarleton female students he allegedly preyed upon (including by attempting to have sex with a player's girlfriend).  All of these allegations, which were later spread throughout Tarleton's baseball organization and staff, as well as externally with community members and Tarleton donors, were and are false.

19.     Meade later discovered that on this same day, Hunt met with Defendant O'Quin ("O'Quin"), Tarleton's Baseball Sport Supervisor, for approximately five-hours at a local coffee

shop and told her the same lies he told the players about Meade.  O'Quin responded that Hunt should get the players involved to complain about Meade in order to get Meade terminated.

20.    After lying to the players about Meade, Reed and Hunt told the players that Hunt received a job offer from the Padres, and that the only way Hunt would stay at Tarleton to save them from Meade was if Meade was somehow terminated from his employment as head coach so that Hunt could take his job.  Reed told the players that if they wanted Hunt to remain and become the head coach, they would be required to come up with reasons to make a formal complaint of their own to Tarleton.  Reed and Hunt lied to the players about Meade, as stated in paragraph 14, to intimidate, frighten, and otherwise induce the players to think of anything they could use to possibly complain about Meade so that he would be removed as their Head Coach, thus supposedly protecting their own well-being, safety, school reputation, and success as collegiate and future professional athletes

21.    The following day, February 1, 2023, the same eight players again met with Hunt and Reed and made their "complaint" about Meade to O'Quin, who, again, was already expecting this to occur after advising Hunt to involve the students the day before.

22.    Two days later, on February 3, 2023, O'Quin telephoned Meade late in the evening to request his presence at a meeting the following day with herself and Defendant Reisman ("Reisman"), Tarleton's Vice President of Athletics.  O'Quin told Meade she did not know the subject matter of the meeting.  This was not true.  Not only had O'Quin advised Hunt on how to proceed in involving the players the day before after their private hours-long off-campus meeting, but O'Quin had by then also personally received the complaint from the group of players on February 1, 2023, and had already met with them again earlier in the day on February 3, 2023,

only hours before calling Meade to request a meeting.  Regardless, Meade was provided with no notice what the meeting would be about, and innocently assumed it was to discuss the raise Meade had requested for Hunt to try to convince Hunt to stay at Tarleton as an Assistant Coach instead of taking the job with the Padres.

23.     On the morning of February 4, 2023, just minutes before the scheduled meeting with O'Quin and Riesman, Meade ran into Hunt on the baseball field and asked about Hunt's pending decision regarding the offer from the Padres.  Hunt gave no indication of the conspiracy now afoot, and the two embraced before Hunt said he would speak with his wife again and have an answer for Meade the following day as to whether he would accept the job with the Padres.

24.     Meade then attended the meeting with O'Quin and Riesman, which was also attended by Senior Associate AD for Compliance Eric Heier.  Meade was handed a letter from Reisman stating that effective immediately he would be suspended with pay "while the university investigates allegations made against you.  This suspension is in accordance with Texas A&M System Regulation 32.02.02.  Section 4.  This suspension with pay will help protect your interests, the interests of other employees, and the institution.  For the duration of the suspension with pay, you will not be permitted on campus and directed to have no contact with students." The letter did not provide any notice of the allegations, but directed that any questions about the complaint or investigation process should be made to Amy Browder in Employee Services.

25.     All representatives of Tarleton in attendance during the February 4, 2023, meeting with Meade denied knowing anything about what the complaint was regarding, explaining to Meade that the complaint had gone through HR/Employee Services.

26.     Heier explained to Meade after the meeting that he personally truly didn't know

the subject matter of the allegations, but would be permitted to tell Meade if he did, albeit without discussing details.

27.    O'Quin and Reisman, who in-fact did know the substance of the allegations, had no legitimate reason to deny knowing anything about the allegations against Meade or refusing to advise him what the allegations were.

28.    That same day, February 4, 2023, now only three days since the players' complaint to O'Quin, at approximately 11:00 A.M., Reisman met with the entire team and informed them that the school administration had decided to "go in a different direction" with respect to Meade, and that Hunt would now become the interim Head Coach.  On that same day and at about the same time, Athletic Trainer Whitney Smith was told by Hunt during practice that "they fired Meade" that morning.  Hunt told Smith that Meade had serious mental issues and had looked "really rough" during the prior two weeks, to the point of being hospitalized (Meade and his daughter had visited an ER for stomach flu treatment the week prior). Hunt explained it was not safe for Smith to be at the practice facilities alone, that the police would be watching the parking lot, that Meade was a "ticking time bomb," and could "burn the whole place down."

29.    At a basketball game that same afternoon of February 4, 2023, O'Quinn informed Baseball Academic Advisor Shelby Holloway that Meade had "stepped way for personal reasons" and that Ms. Holloway should inform O'Quin if Meade contacted her for any reason.

30.    That evening of February 4, 2023, at approximately 6:45 P.M., still unaware of Hunt's conspiracy with Reed to get Meade terminated, Meade visited Hunt at his residence to let him know what had just occurred.  Rebecca Hunt, Hunt's wife, answered the door, but immediately closed the door in Meade's face without addressing Meade at all.  Meade, surprised and not

understanding why she did so, texted Hunt to ask what just happened as follows: "Coach- Sorry just wanted to talk for a few min. Not really sure what is going on and I know you have some big decisions to make."

31.    Less than two hours later, at 8:20 P.M. on February 4, 2023, Reisman texted Meade and told him he was aware that he had gone to Hunt's residence but was not permitted to contact any staff members or students during the investigation.  Admitting that he knew Meade at this point still had no notice of the allegations against him, Reisman texted, in part: "I understand that it is difficult for you to not know what is going on, but it is unacceptable for you to deliberately disregard a clear directive."  Reisman texted that "HR questions" could go to Amy Browder or Eva Lopez, and "other appropriate questions or requests (example: you need to get something from your office)" could be sent to him.  Making it clear that he would continue to refuse to provide any notice to Meade about the nature of the allegations against him, Reisman concluded: "I will not talk with you about the allegations, the investigation, or general work matters."

32.    On February 5, 2023, at approximately 7:00 P.M., now only four days after the complaint from the players to O'Quin, Defendant Hurley ("Hurley"), the President of Tarleton, and Reisman, then met together with the entire baseball team.

33.    At the meeting with the team on February 5, 2023, Hurley stated that while "he did not have all the facts," Reisman had contacted him two days prior and informed him of "the situation."  He said that he was allowing Reisman to handle the investigation and would "stand by what he decided."  Reisman then spoke to the team, with President Hurley still present, and explained that Hunt would now officially become the interim Head Coach, and that Hunt had "better morals and would coach them better" than Meade.  Reisman added that Meade "had" a

contract, while Hunt was "working for one," so Hunt would therefore do a better job.

34.     The next day, February 6, 2023, only <u>two days</u> after Meade was suspended, Hunt cut three Tarleton baseball players who were among a group who did not participate in the complaint against Meade.  These three players, each of whom was a promising student athlete, were told Hunt's decision to cut them was due to Meade's roster size being too large.

35.     On February 7, 2023, now six days since the complaint by the players to O'Quin, Defendant Browder, one of the two HR representatives Meade could speak with, emailed Meade as follows: "As an update, we are still in the process of reviewing information. I will continue to provide you with updates throughout the process."  No further updates were ever provided by Ms. Browder, however, or anyone else in the HR department at Tarleton, despite being the only two permissible contacts Meade could have with Tarleton during the investigation.

36.     On February 8, 2023, Meade's first legal counsel on the matter sent correspondence to Defendants Hurley, Reisman, and Browder demanding more information and proper notice regarding the allegations being investigated, and an immediate reinstatement.

37.     Also on February 8, 2023, D1 Baseball, a sports journalism publication, contacted Meade because they had learned of what they referred to as the "shakeups at Tarleton," and requested information, which Meade was unable to provide due to a lack of information from Tarleton.

38.     Meade's legal counsel was contacted two days later on February 10, 2023, and advised that the Texas A&M Office of General Counsel would now be overseeing the case and investigation, but without any further notice or information regarding the allegations or any other information about the investigation.

39.     On February 10, 2023, now nine days since the players' complaint to O'Quin, Meade discovered that Hunt had received a substantial pay increase far above that which would normally be received by an Assistant Coach.

40.     On February 13, 2023, less than two-weeks since the players' complaint to O'Quin, Meade discovered that Tarleton had hired a new full-time pitching coach, meaning Tarleton now had the maximum number of coaches that a team could have.  If Meade were to ever return from his indefinite and still mysterious suspension, one of the other coaches on the team would now have to be terminated.  Meade continued to wait for any further information about the allegations from Tarleton.

41.     On February 22, 2023, Meade discovered second-hand (not from Tarleton) that a member of the A&M Board of Regents had expressed learning that the allegations against Meade included an addiction to Adderall, that his practices exceed NCAA limits on two occasions, and that Meade had even physically assaulted a player.  Still without any notice of the allegations against him from Tarleton, Meade was forced to continue to wait for more information while discovering that rumors were now spreading about the reasons for his suspension well outside of the athletics department of Tarleton.

42.     On March 1, 2023, Meade learned, once again second-hand (not from Tarleton), that Tarleton's HR group had been unable to obtain any further information from the players who made the initial complaint, and that the Office of General Counsel had also failed to develop anything incriminating about Meade to support the still unknown allegations.

43.     Also on March 1, 2023, D1 Baseball contacted Meade yet again, advising him that questions were continually being raised about Meade's status with Tarleton since the season

was now well underway, and that they had noticed a pitching coach had been hired while Hunt was made the new interim Head Coach. The journalist mentioned that this happening with no record of it on the Tarleton site was "very very odd." Meade again had no information with which to respond other than thanking them for their inquiry, since he still had no notice regarding the allegations.

44.    On March 2, 2023, now one month from the initial complaint by the group of players, Meade was contacted by Mike Yeager, a coach at Johnson County Community College in Kansas, who told Meade he had now heard about the "disaster at Tarleton state," and that Meade had been suspended for racism. The rumors about Meade were now confirmed as being spread well outside of Tarleton, and yet Meade himself still had no notice about the allegations from Tarleton.

45.    The next day, on March 3, 2023, Ruben Rodriguez, a coach at Texas A&M International, told Meade he had been informed by Tarleton Alumnus David Vega that Meade was suspended because of racism and peeing on the field in front of recruits, and that prostitutes were also somehow involved.

46.    Despite the rumors about Meade now circulating among A&M officials and the broader college baseball community nationally, Meade had still not been informed or given notice regarding the complaint details in any manner by anyone at Tarleton, and he continued to wait without the ability to freely speak to anyone involved or otherwise, or to assist in any manner to clear his own name.

47.    On March 6, 2023, Tarleton Baseball Academic Advisor Shelby Holloway ("Holloway") contacted Meade and said she had obtained information that would be important for

him to be aware of.  Holloway explained that Tarleton baseball player Jake Burcham told her he was one of eight players who had derived a complaint about Meade after being convinced by Reed and Hunt to do so, as described in the foregoing allegations.  This was the first indication Meade had regarding the presence and nature of the fraudulent conspiracy involving Hunt, Reed, and O'Quinn.

48.     Three days later, on March 9, 2023, Holloway reported Burcham's confession to Reisman.  According to Ms. Holloway, Reisman responded to her by asking, "So it was all lies and they were coached on what to say? That's what it sounds like to me, is that what it sounds like to you?" She responded "Yes," to which Reisman thanked her, and told her she did the right thing by reporting it to him.  Neither Reisman, nor O'Quin, nor anyone from HR at Tarleton, informed Meade of this important development, and Meade continued to lack any notice of the allegations against him.  Meade had only learned of the conspiracy against him through informal and unofficial channels, due to Ms. Holloway being willing to contact him to let him know what she had discovered from Burcham.

49.     The next day, on March 10, 2023, Kemuel Thomas-Rivera, a senior on the previous year's team called Meade and told him that current player Dylan Choy Foo confirmed Reed contacted him and other older players to tell them about how bad Meade really was, and that Hunt was going to leave to take another job unless Meade was gone.  Reed stated, "So if you want [Hunt] to stay you are going to have to do something."  Choy Foo told Thomas-Rivera that the players tried to think of anything they could possibly think of to complain about Meade and tried to come up with things from the years past that they could bring up now, as though they were issues the players had with Meade when in-fact they would not have ever complained about him

without being urged by Reed to do so.  Choy Foo told Thomas-Rivera that Reed had said Meade was racist and bipolar and brought up things that happened during baseball practices. Choy Foo said they really didn't think the Tarleton officials would believe their complaints or really do anything about it.  To Choy Foo's surprise, Tarleton immediately acted on their complaint by suspending Meade. Choy Foo, who was unaware of O'Quin's involvement in the contrived plan to get Meade terminated, said it felt like Tarleton didn't like Meade or were looking for a reason to get rid of him after receiving their complaint.  Choy Foo admitted to Thomas-Rivera that what the eight players had done was "pretty shitty," but that they all went along with it anyway.

50.     On March 14, 2023, now over 6-weeks since the initial complaint by the players to O'Quin, Holloway had a meeting with Browder and Jason Waters of Tarleton HR/Employee Services regarding the confession Holloway had received from Jake Burcham.  Holloway also confirmed that she had been told Coach Hunt was there when Reed met with the players.  Meade learned, again second-hand but this time by another Tarleton employee with personal knowledge, that O'Quin was growing worried that the investigation against Meade was not proceeding "the way it was supposed to."

51.     On March 15, 2023, current player Isaiah Campa told Holloway he had heard that the allegations against Meade were racism, stealing money, and hitting on girls. Campa also said Reed told him that Meade was stealing money from Tarleton and that's why the players didn't get fed properly last year after games or with snacks in the dugout. Reed also told Campa that Meade was keeping some of the money and with Meade gone, that was why they were eating so much better. Campa also said Reed told him Meade was not going to give the players "throwback" hats that Meade had ordered for the home opening weekend, and instead he was going to sell them and

keep the money.  Meade was still not informed about any of the allegations against him by anyone at Tarleton.

52.     On April 5, 2023, Meade learned that President Hurley had reportedly told a local business owner near Tarleton that Meade paid for prostitutes on a baseball trip, and that Tarleton was seeking video evidence but had not yet been able to locate any.

53.     On April 14, 2023, Meade learned that current player Payton Pennington was yet another player who came forward admitting that he was asked by Reed to go along with the plan to oust Meade from his job, but that Payton declined, as did another fellow player Kooper Shook.

54.     Finally, on April 27, 2023, almost three months since Meade was suspended and instructed not to speak to anyone regarding the matter other than Tarleton HR, Meade and his counsel were granted a meeting with Browder, Jason Waters of HR, and Elinore Tecson from the Texas A&M office of General Counsel.  While neither Browder nor anyone else from Tarleton at the meeting advised Meade of the allegations with any specificity, the group instead used this time to simply ask questions of Meade.

55.     Meade was shocked that the questions they had for him at this first meeting since his suspension involved matters such as wrestling with a player, grabbing a player's shirt, practicing after dark, urinating on a baseball field, and knocking a granola bar out of a player's hand.  Other questions related to derogatory language about learning disabilities (despite Meade's wife being a special education teacher, and his sister having special needs), and non-specific racist comments that were all denied by Meade.

56.     Meade was asked if he had ever had a player translate Spanish for him while speaking to Hispanic construction workers near the baseball field, which he had.

57.      Meade was asked if he had asked about grades and scholarships in front of other players, and he responded that generally he did not, but explained the details of a specific situation that he turned into an opportunity to encourage all of the players on the importance of attending class and keeping up academics, and not to embarrass any particular player.

58.      These questions were the first indication Meade had of the allegations that had resulted in his suspension as head coach, and the destruction of his hard-earned reputation.  In summary, after an entire season of suspension and compelled silence regarding mysterious allegations, the questions posed to Meade appeared to be nothing more than what could have been routine questions from HR followed in the usual course by fact gathering, instructions on ways they might have preferred for Meade to handle specific situations, and at worst, some form of written documentation.  None of this occurred with Meade.  According to Section 1.1.2 of Chapter 32.02.02 of the Texas A&M Regulations (Discipline and Dismissal of Nonfaculty Employees): "Although the principle of progressive discipline found in this regulation is not required for any nonfaculty employees, it is encouraged as a good management practice when practicable."  There was no reason that following this encouragement by management would have been impractical, and yet Tarleton failed to follow it in multiple ways.  As Section 3.1 of the Regulations continues: "In most cases, inappropriate job-related conduct or job performance can be addressed by the supervisor who is counseling the employee and providing guidance on appropriate conduct or performance.  If circumstances warrant (i.e., more serious acts or for progressive discipline), the supervisor may issue a formal disciplinary action."  Section 31 continues to list written reprimand, suspension without pay, transfer, demotion or reduction in salary, and finally dismissal, as options to consider.

59.     Meade responded to the questions they were asking, and therefore by implication learning that these might be the allegations that led to his suspension by informing them he had learned about the conspiracy by Hunt and Reed to oust him from his job, despite their failure to inform him of this important and material development.  He also explained that many of the players who were involved were likely intimidated to say anything now due to fear of retaliation during the season by getting less time on the field.  They agreed that it was common for students to not fully cooperate due to fear of retaliation or discipline.

60.     On May 1, 2023, four days after asking questions of Meade during their meeting on April 27, 2023, and while still failing to formally provide notice to Meade about the specific allegations against him, Reisman contacted Meade and told him that his contract would not be renewed when it expired on May 31, 2023.

61.     Reisman then sent a letter to Meade, also dated May 1, 2023, confirming Meade would be considered terminated effective May 31, 2023 "Without Cause" as Tarleton was "exercising its option not to renew your employment contract."

62.     There were no reasons ever provided as to why Tarleton was choosing not to renew Meade's contract.  Meade was still provided no notice whatsoever as to the reasons for Tarleton's decision of non-renewal for his contract, despite it being obvious that after four years of successive and continuous renewals, it was solely the allegations against Meade which led to his suspension and that were now the real reason for Tarleton's decision not to continue on with Meade as Head Coach of its baseball program.

63.     Meade reasonably expected to continue with his contract renewals as Head Coach because when President Hurley was hired, he told all the head coaches during an athletics staff

meeting (including Meade) that he supports them and understands the challenges of the transition the program was making into Division I college athletics. Meade recalls that President Hurley specifically said that since there were several young head coaches (including Meade) that President Hurley was "going to give you the opportunity to see this transition" complete, which would occur 4 years from July 31, 2020.

64.     Meade also reasonably expected to continue with contract renewals since in Meade's Staff Performance Review for June 1, 2020, to May 31, 2021, Reisman wrote under Goals: "Year 2 of Transition – Compete for a WAC Southwest Division Championship" and "Year 3 of Transition – Compete for a WAC overall Conference Championship and Tournament Championship." Meade was given a renewed contract for each year, and yet Tarleton's practice was to document employment goals that were outside of the current contract year, further supporting President Hurley's statement that Meade would be given the opportunity to see the transition to Division I athletics.

65.     Notably, none of Meade's performance evaluations (including the one preceding his termination) were ever unsatisfactory, and Meade's contract(s) of employment with Tarleton had been renewed previously and continuously based on his performance since his initial contract commenced on January 1, 2019. Meade was employed by Tarleton for 3 years, 10 months, and 8 days before Tarleton's decision not to renew his contract and thereby end his employment.

66.     Over the month that followed his termination, Meade continued to learn from multiple witnesses about the conspiracy to oust him from the Tarleton baseball program. Multiple players, many of whom were involved in the original complaint, continued to tell Meade they knew what had occurred, and that they believed it was an unfair situation involving Meade being

framed.

67.    Meade learned that HR eventually threatened the original players with ineligibility if they did not cooperate with HR's investigation on or about the week of May 15, 2023 (2 weeks <u>after</u> Reisman contacted Meade to inform him of his termination without cause and contract non-renewal).  Meade learned that the players then agreed amongst each other to tell HR that it was their own idea.

68.    On May 25, 2023, Hurley and Reisman discussed that any other candidates for the Head Coach position would want more compensation than Tarleton could afford, so despite their discovery of the conspiracy against Meade, Reisman was going to officially give the head coach job to Hunt.  Hurley responded that while he would back Reisman's decision to do so, he should be aware that the investigative report was basically complete, and the conclusion was that <u>Hunt had "caused this entire mess</u>."

69.    Hunt was eventually removed as the interim head coach and was not offered the job as head coach.  Hunt is now a development coach with the Texas Rangers baseball organization.

70.    The mismanagement of the investigation and failure to follow Tarleton's own processes and Regulations impacted not only Meade personally, but also resulted in the reckless financial management of Tarleton's publicly funded baseball program, a matter of public concern.

71.    Texas A&M System policies require that when a complaint is made about an employee, there is a written form that must be filled out.  If the complaint concerns events that are more than seven business days old, the complaint is untimely and must be dismissed.

72.    Had Tarleton followed its own policy, all such untimely complaints would never

have become the basis of an investigation.  Further, the complaint form is supposed to be supplied to the person who is the subject of the complaint (in this case, Meade) within <u>5 business days of the complaint</u>.  This allows the subject to know what they are being accused of and either defend themselves or admit to whatever they are accused of and seek to rectify the situation.

73.    Tarleton has admitted that no such written complaint exists in this matter.  They have never provided notice nor explained what Meade was accused of, leaving Meade to assume that the allegations are based upon the questions asked of him in the April 27, 2023, interview, just four days prior to being notified of his contract non-renewal and termination without cause.

74.    By terminating Meade without cause and using the non-renewal of his contract as a pretextual reason for doing so, Tarleton has completely sidestepped its responsibility to provide Meade with notice about serious allegations made against him that led to a season-long publicly noticed suspension, effectively cost Meade his job, and led to the uncontrolled spread of various damaging rumors involving Meade's alleged use of prostitutes, theft, mental health problems, physical assault, pedophilia, drug addiction, and otherwise.

75.    By terminating Meade without cause and using the non-renewal of his contract as a pretextual reason for doing so, Tarleton also effectively deprived Meade of any method for appealing the actual grounds for its decision and therefore Meade had no opportunity to be heard, confront witnesses, review evidence, or otherwise address the allegations.

76.    Tarleton has refused to provide the communications and records related to their investigation through Meade's use of an open records request.  Tarleton provided only Meade's personnel file, which did not contain any information related to the investigation despite being requested.

77.     Despite Tarleton learning about the conspiracy against Meade, Tarleton chose not to make a public statement to correct the false rumors that had spread about Meade during the resulting suspension and investigation, and instead decided to remain silent in a self-interested effort to conceal its own reckless handling of a complaint prompted by what Tarleton now knows was a fraudulent conspiracy involving its own employees (made possible by the complicit negligence of Tarleton's President and other Tarleton leadership following a pattern and practice of mismanagement of human resources matters) to oust Meade from his position as Head Coach.

78.     Tarleton's failure to publicize the results of its investigation has resulted in the implication that the false rumors regarding Meade's suspension and eventual termination from Tarleton are true.

79.     Meade has repeatedly requested that Tarleton clarify the matter and issue a public statement clearing his name, but Tarleton has refused.

80.     Meade has applied for several Division I coaching jobs since his termination from Tarleton, all of which he is qualified for, has experience with, and would normally have been a sought-after candidate invited, at minimum, to participate in the interviewing and screening process.  Meade's applications instead most often go completely unacknowledged, and he is not invited to even discuss positions that his agent would normally view as a perfect fit for both Meade and the colleges in question.

81.     In just one example of the foregoing, Meade applied for a head coach position at Missouri State, his own alma mater, and a team that Tarleton had beaten with Meade at its helm as head coach. Despite his obvious qualifications, Meade's application received no interest. Meade's further inquiry about a pitching coach position at Missouri State went unacknowledged.

Meade later discovered the pitching coach position went to a candidate the same age as Meade who had never held a paid coaching job and was a student coach for one year.

82.     Meade was one of the youngest head coaches in Division I college baseball before the events described in the foregoing allegations resulted in his termination from Tarleton, and due to Tarleton's handling of the matter and unwillingness to correct and publicize the actual results of its investigation is unable to obtain any Division I coaching position.

83.     Unable to obtain a Division I position, and continuing to fight the stigma left behind by Tarleton's refusal to issue a public statement regarding the outcome of its recklessly publicized investigation, in July of 2023 Meade eventually made the difficult choice to relocate his family back to Meade's hometown of Kansas City to settle for a position coaching baseball at Metropolitan Community College.  Meade's annual compensation as a junior college baseball coach is $71,500, over $10,000 less per year than the $82,500 salary he last made at Tarleton, with an even larger difference over what Meade would have made with continued increases in compensation had he remained Tarleton's Head Coach.  Meade is informed, and on good faith believes, that as of September 2024, Tarleton's Head Coach made $150,000 annually.  Tarleton's refusal to correct and publicize the results of its botched investigation means that Meade can only secure employment from those who personally know him well enough not to believe the stigma created by Tarleton's treatment of groundless allegations, premature actions taken without proper notice, and shocking rush to judgment.

84.     Meade is informed, and on good faith believes, that in the year prior to Tarleton's suspension and later termination of Meade without proper notice or opportunity to be heard, Tarleton suspended its track and field coach Pat Ponder also without explanation.  Demonstrating

a custom, pattern, and practice of recklessness and indifference in its handling of complaints and investigations, rumors about Ponder grew and spread during the over ninety (90) days of investigation during Ponder's suspension, all while Ponder had no actual notice as to the allegations. Tarleton eventually asked Ponder to resign despite the investigation clearing him.

85.     Meade is informed, and on good faith believes, that in the months after his suspension head volleyball coach Mary Schindler was suspended soon after volleyball student athletes contacted O'Quin to complain about her. O'Quin met with the students in a separate building at Tarleton and then took their complaints to HR. Schindler had been in a dating relationship with Reisman's son, so Reisman vowed to protect her after telling her he was forced to put her on leave. Notably, however, Reisman informed her of the complaints against her, and a month later she was reinstated and provided with the complete investigation report. Reisman's provision of notice in this manner indicates Reisman and others in authority at Tarleton were capable of doing the same for Meade, yet intentionally refused to do so.

## CAUSE OF ACTION NO. 1:
## DEFENDANTS' ACTIONS CONSTITUTED A DEPRIVATION OF
## MEADE'S LIBERTY INTERESTS WITHOUT REQUIRED DUE PROCESS
(Fourteenth Amendment, 42 U.S.C. § 1983)

86.     Plaintiff reasserts and realleges all preceding paragraphs as if fully restated herein.

87.     The individual and joint actions of the Defendants deprived Meade of his liberty interests in his reputation without constitutionally required due process, including a lack of notice and opportunity to be heard, and refusal to do so despite Meade's repeated but denied requests both directly and through counsel.

88.     Meade was first publicly suspended for an entire baseball season and subsequently terminated from employment amidst false allegations of misconduct that spread throughout

Tarleton, the immediate community, and nationwide, in part because of Tarleton's own President and others at Tarleton publicizing such allegations while the investigation was underway and before the conspiracy against Meade was uncovered.

89.    Tarleton did nothing to document or publish the conspiracy against Meade even after it was discovered, choosing instead to remain silent and pretextually choose to simply not renew Meade's contract, despite knowing that the allegations were now spread throughout the baseball community nationwide.

90.    Meade was thus terminated in a manner that created a false and defamatory impression about him, stigmatized him, and foreclosed him from other employment opportunities as a result.

91.    Tarleton has a policy, practice, or custom of failing to train its employees and officials, including those named as Defendants herein, in the proper procedures and conduct of investigation into complaints regarding Tarleton personnel that would prevent the due process violations alleged herein.

92.    Tarleton was deliberately indifferent to the risk that such failure would pose to individuals like Meade, creating an obvious potential for a constitutional violation of Meade's due process rights.

93.    Tarleton's policy, practice and custom fails to provide individuals with adequate notice or an opportunity to be heard, and systematically deprives individuals of meaningful procedural safeguards.

94.    Defendant Hurley, as President of Tarleton, was aware of Tarleton's above policies, practices, and customs, was deliberately indifferent to the need to rectify it, and had final policymaking authority to cause the violation of Meade's due process rights.

95.     Thus, Tarleton is also liable, in addition to the individual Defendants named, for violating Meade's due process rights.

96.     Defendant Hurley, as President of Tarleton, had direct knowledge of and consented to the actions being taken against Meade without a proper investigation being completed, and publicly stated he would support whatever conclusion was reached by Reisman, whom he then personally witnessed making statements and taking actions based on conclusions about the allegations without an investigation having been completed.

97.     Since President Hurley was aware of Tarleton employees reaching conclusions without a proper investigation, and facilitated, approved, condoned, or turned a blind eye toward it, Hurley additionally has supervisor liability for the actions and omissions of any other Defendants (including Reisman) and other third parties who carried out or permitted the activities which led to a violation of Meade's procedural due process rights under the Fourteenth Amendment.

98.     Defendants Hunt, Reed, O'Quin, and Reisman acted intentionally, in bad faith, and/or with reckless indifference to Meade's due process rights under the Fourteenth Amendment.

### CAUSE OF ACTION NO. 2:
### DEFENDANTS' ACTIONS CONSTITUTED A DEPRIVATION OF
### MEADE'S PROPERTY INTERESTS WITHOUT REQUIRED DUE PROCESS
(Fourteenth Amendment, 42 U.S.C. § 1983)

99.     Plaintiff reasserts and realleges all preceding paragraphs as if fully restated herein.

100.     The individual and joint actions of the Defendants deprived Meade of property interests in continued employment contract renewals at Tarleton, which had consistently occurred year-to-year for several years prior as a matter of custom and practice both with Meade specifically and with all athletics coaches at Tarleton generally, and were both impliedly and expressly stated

by Tarleton to continue occurring for Meade, including by the written documentation of future employment goals that would extend beyond Meade's current contract term.

101.    By virtue of the foregoing, Tarleton acted to confer or cause conditions which created the existence of a property interest for Meade in reasonably expecting Tarleton to follow its custom and practice of contract renewal.  Tarleton's stated choice not to renew Meade's contract without cause and without providing any comment as to the outcome of its investigation into the complaint against him was pretextual and intended to cover-up its own failure to follow its own written policies requiring the proper documenting and investigating of a complaint against Meade during his employment.  Thus, the true reason and cause of Meade's termination was Tarleton's violation of Tarleton's own policies and Regulations, and a breach of its implied and express promise to keep Meade employed beyond the contract which Tarleton only declined to renew as a pretextual way to terminate Meade's employment and cover-up the exploitation of Tarleton's own reckless investigation customs and practices.

102.    The Defendants, together and individually failed to provide adequate procedural due process before and after depriving Meade of the foregoing property interests by: (i) failing to notify Meade of the allegations against him; (ii) failing to provide a proper grievance procedure for an investigation that could lead to disciplinary or other action that would result in a deprivation of Meade's rights, (iii) reaching erroneous and biased conclusions before and during the investigation; (iv) taking public actions before concluding a full unbiased investigation or having reasonably sufficient independent evidence to support the allegations made, (v) failing to conduct the investigation into Meade within Tarleton's own documented procedures and policies for how to do so (including the process for long term suspension), (vi) failing to conduct the investigation in a timely manner; (vii) failing to notify Meade about material findings, such as its discovery of

the conspiracy against Meade; (viii) failing to give proper notice or opportunity to be heard before reaching its final conclusions and taking actions against Meade, including the decision not to renew his contract, and (ix) choosing not to renew Meade's contract and terminate him without sufficient notice of the proposed action and/or giving any opportunity to respond or appeal.

## CAUSE OF ACTION NO. 3:
### DEFENDANTS' ACTIONS CONSTITUTED A DEPRIVATION OF MEADE'S SUBSTANTIVE DUE PROCESS RIGHTS
(Fourteenth Amendment, 42 U.S.C. § 1983)

103.     Plaintiff reasserts and realleges all preceding paragraphs as if fully restated herein.

104.     The individual and joint actions of the Defendants also violated Meade's substantive due process rights under the Fourteenth Amendment because they were arbitrary and capricious, and involved deliberate indifference by several of the Defendants who are Tarleton officials.

## CAUSE OF ACTION NO. 4:
### THE ACTIONS OF DEFENDANTS REED AND HUNT TORTIOUSLY INTEREFERED WITH MEADE'S PROSPECTIVE BUSINESS RELATIONS

105.     Plaintiff reasserts and realleges all preceding paragraphs as if fully restated herein.

106.     Defendants Reed and Hunt were aware of the reasonable probability of Meade's contract being renewed and acted with the conscious desire to prevent it from being renewed.

107.     Defendants Reed and Hunt tortiously interfered with Meade's contract renewal by fraudulently conspiring to lie to the players about Meade to induce the players to complain about Meade so that Hunt could obtain the Head Coach position.

108.     The conduct of Defendants Reed and Hunt did cause Meade to not have his contract renewed, and he suffered economic loss and reputational harm as a result.

## DAMAGES

109.    Plaintiff reasserts and realleges all preceding paragraphs as if fully restated herein.

Plaintiff sues for the following:

a.    Pecuniary loss sustained by Plaintiff in the past, including lost wages;

b.    Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future, including a reduction in wages and lost job opportunities over the span of his entire future professional baseball coaching career;

c.    Loss of good name, reputation, honor and integrity;

d.    Loss of companionship and society sustained in the past;

e.    Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future;

f.    Mental and emotional anguish sustained in the past;

g.    Mental and emotional anguish that, in reasonable probability, Plaintiff will sustain in the future;

h.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, including, but not limited to, expert fees; and,

i.    Granting Plaintiff such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

110.    Accordingly, Plaintiff asks that the Court order Defendants to: (i) reopen and properly close its investigation fully documenting all findings and results, including, but not limited to, Tarleton's discovery of the fraudulent conspiracy that provided the basis for the initial complaint against Meade, (ii) issue a public statement exonerating Plaintiff from those allegations

that were determined not to be true, as well as publicly stating that Meade was terminated without cause, and (iii) enjoin the Defendants from continuing its unlawful employment investigation practices and customs, and follow a written policy sufficiently designed to protect and safeguard the procedural due process rights of Tarleton employees who are the subject of such investigations.

111.    Accordingly, Plaintiff asks that judgment be awarded against Defendants for:

a.    Compensatory damages;

b.    Punitive damages against Defendants Reed, Hunt, O'Quin, Reisman, and Tarleton;

c.    Attorneys' fees, including reasonable and necessary expenses such as expert witness fees, pursuant to 42 U.S.C. § 1988;

d.    Court costs;

e.    Prejudgment and post-judgment interest at the highest rate allowable by law; and

f.    All other relief to which Plaintiffs are justly entitled.

Respectfully submitted,

*/s/ Kenneth P. Trosclair*
Kenneth P. Trosclair
State Bar No. 24033548
Email: Pete@LovinsLaw.com
**LOVINS TROSCLAIR PLLC**
1301 S. Capital of Texas Highway
Austin, TX 78746
Phone:        (214) 484-1930
Fax:            (214) 972-1047

**ATTORNEYS FOR PLAINTIFF**